**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 09-87 |
| | ) | |
| RICHARD SHUMAKER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

### I.  INTRODUCTION

In this action, Defendant Richard Shumaker ("Defendant" or "Shumaker") has filed a motion to withdraw his guilty plea entered at Count One of the Indictment pursuant to a plea agreement with the Government and after a lengthy plea colloquy with the Court on May 20, 2010.  (Docket No. 70).  He now claims that he is innocent of this offense and that his guilty plea was involuntary because his counsel coerced him into pleading guilty and, thus, provided ineffective assistance of counsel to him.  (*Id.*).  The Government opposes Defendant's motion. (Docket No. 76).  The Court held a hearing on Defendant's Motion on February 8, 2011 during which Defendant testified and documentary evidence was presented.  (Docket Nos. 81, 84). Upon consideration of the parties' arguments and the evidence presented at the hearing, and for the following reasons, Defendant's Motion [70] is denied.

### II.  BACKGROUND

#### a.  *The Instant Conspiracy and Related Criminal Proceedings*

The instant action arises out of a criminal conspiracy to commit mail and wire fraud between at least three individuals, Defendant Richard Shumaker, Susan Fawcett and Larry Konter.  (*See* Crim. Nos. 09-87, 08-264, 08-267).  These individuals participated in a scheme to

defraud American Express by "cycling" or "factoring"[1] various credit card accounts in a fashion similar to a "check kiting" scheme.[2] They opened a number of fraudulent accounts, and processed fake sales of goods and services from Shumaker's businesses through these accounts, fraudulently inducing American Express to pay money to cover the fraudulent charges. They also cycled hundreds of thousands of dollars between the various accounts, profiting from the "float" or differences in the due dates set for payments due on each account. All told, the scheme resulted in losses to American Express of $574,134.40.

The alleged criminal conduct by these individuals was initially investigated by American Express fraud investigators. (Govt. Ex. 12). On June 21, 2006, one of the American Express fraud investigators met with law enforcement officers from Allegheny County and the United States Postal Inspection Service and briefed them on his findings regarding Konter's conduct within American Express, including his dealings with Defendant at issue in this case. (*Id*. at ¶¶ 9-14). The investigation was then taken over by the Financial Crimes Task Force of

---

[1]    In the general sense, "factoring" is "[t]he buying of accounts receivable at a discount. The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." BLACK'S LAW DICTIONARY (9th ed 2009). These types of agreements permit a business with cash flow problems to borrow against its accounts receivable, providing cash faster than awaiting payment from vendors, which can be lengthy net 90 or 120 day payment terms. *See Estate of Beim v. Hirsh*, 121 Fed.Appx. 950, 951-52 (3d Cir. 2005).

> "Factoring a credit card transaction" generally refers to the practice by which a merchant lacking a valid credit card account with a bank sells (usually in bulk) or otherwise launders its credit card transactions through a merchant who does have a valid merchant credit card relationship with a bank. This is typically done because the seller cannot obtain a merchant credit card account at the bank. He may be selling illegal products ( e.g., prostitution, gambling), or the credit card company received too many complaints from unhappy customers demanding a refund. Some credit card companies also refuse to extend credit card merchant accounts to telemarketers, because of the high potential for fraud and the absence of proof that the transaction really occurred (such as a signed credit card slip).

*Spencer v. Hill*, No. CV 01-1794 ST, 2003 WL 25279367, at *2 (D.Or. Dec. 30, 2003) (citations omitted).

[2]    As discussed in further detail *infra*, a civil action was filed by a number of entities, including American Express, against Defendant in the United States District Court for the Western District of Kentucky. *See Corporate Services v. Richard Shumaker*, No. 5:07-CV-00024-R, 2010 WL 4340599 (W.D.Ky. Oct. 27, 2010).

Southwestern Pennsylvania, consisting of Allegheny County detectives as well as agents of the

United States Postal Inspection Service and the United States Secret Service. (*Id.*). U.S. Postal

Inspector David Anderchak led the federal investigation. (*Id.*). During the investigation,

Inspector Anderchak participated in interviews of Fawcett and Shumaker, on January 11, 2007

and February 20, 2007, respectively. (*Id.* at ¶¶ 15, 22; *see also* Govt. Ex. 1). Defendant made a

number of incriminating statements during his interview. (Govt. Ex. 1). He described the

mechanics of the cycling scheme. He also admitted, among other things, that: he trained Fawcett

and directed her during the cycling scheme; he directly paid Konter fees of up to $10,000.00 on

several occasions for his performance of his role; there were never any goods or services sold

supporting the credit card charges which were made; the cycling scheme grew too quickly and

they made bad decisions; and that American Express suffered losses of $395,000.00. (*Id.* at 2-4).

On April 30, 2007, Inspector Anderchak submitted a sworn affidavit in support of a

request for a search warrant for records maintained by Defendant at his place of business, 325

Commerce Drive, Wilmerding, Pennsylvania. (Govt. 12). The affidavit details the entire

investigation and his findings regarding the alleged criminal activity of Defendant and his co-

conspirators.[3] (*Id.*). The affidavit was sworn before United States Magistrate Judge Francis X.

Caiazza and a search warrant was issued. (*Id.*). Subsequently, the warrant was executed and

numerous documents, including email communications and other correspondence, were seized

from Defendant's office. (PIR at ¶ 16).

Konter and Fawcett were both charged with one count of conspiracy to commit mail and

wire fraud in separate indictments filed on July 9, 2008. (Cr. No. 08-267, Docket No. 1; Cr. No.

08-264, Docket No. 1). Fawcett pled guilty to said offense shortly thereafter, on September 18,

---

[3]     The contents of the sworn affidavit is fully detailed in the Probation Office's summary of offense conduct, which is included in its entirety below. *See* pp. 11-14, *infra*.

2008.  (Cr. No. 08-264, Docket No. 16).  Konter also pled guilty on March 6, 2009.  (Cr. No. 08-267, Docket No. 21).  The sentencing hearings for both Fawcett and Konter were continued a number of times because both were cooperating with the Government against Shumaker.[4]

A few days after Konter's guilty plea, on March 10, 2009, a federal grand jury returned a one-count indictment against Defendant, alleging that he conspired to commit mail and wire fraud in violation of 18 U.S.C. § 1349.  (Docket No. 1).  Similar to the charges against Fawcett and Konter, the grand jury charged that, from in or around June 2005 until in or around December 2007, Defendant did knowingly and willfully conspire, combine, confederate, and agree with other persons (i.e., Konter and Fawcett) to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  (*Id*.).  Inspector Anderchak contacted Defendant shortly after the Indictment was filed, on March 12, 2009, to advise him of the charge and that he would be receiving a summons to appear in federal court on March 31, 2009.  (Govt. Ex. 2).  Defendant returned Inspector Anderchak's phone call and, although Defendant's responses were increasingly evasive, he made additional incriminating statements to him.  (*Id*.).  Chief among them, when questioned regarding who should repay American Express for the losses caused by the cycling scheme, Defendant stated that he should be one of the individuals required to pay American Express back.  (*Id*. at 2).

On March 31, 2009, attorney Patrick J. Thomassey, Esquire[5] entered his appearance as counsel in this case for Defendant.  (Docket No. 5).  That same day, Defendant was arraigned

---

[4]     Fawcett's sentencing was initially scheduled for January 9, 2009.  (Cr. No. 08-264, Docket No. 19).  However, her sentencing was continued a number of times because, as set forth by the Government in multiple unsealed filings, she was cooperating against other individuals who were under investigation, including Larry Konter and Richard Shumaker.  (Cr. No. 08-264, Docket Nos. 28, 34, 41).

        Konter's sentencing was initially scheduled for July 10, 2009.  (Cr. No. 08-267, Docket No. 22).  His sentencing was continued until further order of court given his cooperation against Shumaker.  (Cr. No. 08-267, Docket No. 26).  His cooperation against Shumaker was also disclosed via an unsealed filing.  (*Id*.).

before the late Chief Magistrate Judge Amy Reynolds Hay and was released on a $10,000 unsecured appearance bond, which permitted him to reside at his home in Florida, outside the Western District of Pennsylvania. (Docket Nos. 7, 9, 10). The Government provided Mr. Thomassey with Rule 16 materials at the arraignment, which consisted of copies of the "search warrant including the affidavit in support of the search warrant" and Anderchak's two memoranda of interviews from the February 20, 2007 and March 12, 2009 interviews of Defendant. (Docket No. 9; *see also* Govt. Ex. 1, 2). As noted, these documents thoroughly detail Defendant's alleged criminal conduct as discovered by Inspector Anderchak and the other law enforcement officers during the investigation. (Govt. Ex. 1, 2, 12). They also fully support the criminal allegations set forth in the Indictment. (*See* Docket No. 1).

Defendant then filed six motions for extensions of time to file pre-trial motions, which were all granted by this Court. (Docket Nos. 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22). Subsequently, on April 8, 2010, Mr. Thomassey filed a motion to withdraw as counsel for Defendant, citing "irreconcilable differences" between him and Defendant. (Docket No. 23). This Court denied Mr. Thomassey's motion to withdraw appearance, without prejudice to re-submission upon the entry of appearance of alternative counsel on behalf of Defendant. (Docket No. 24). None came.

On April 12, 2010, the Court issued a Pretrial Order, which set, amongst other things, jury selection and trial to commence on June 1, 2010 at 9:30 a.m. (Docket No. 25). The Government then filed a motion requesting that a status conference be convened. In his request for a status conference, Government counsel stated his concerns with the trial date and

---

[5]     Mr. Thomassey is a graduate of Duquesne University School of Law and has been a member of the Bar of Pennsylvania since April 26, 1976. He has practiced criminal law, particularly, criminal defense, for in excess of thirty-five years. He has extensive trial experience and his practice focuses on high-profile cases. He is well-respected among the bar and bench.

preparation for same given that Defendant had not made any attempts to review discovery and his belief that Defendant, who continued to reside in Florida, was "not taking this case seriously." (Docket No. 26). The Court granted the Government's motion and held a status conference on April 20, 2010. (Docket No. 27, 29). During the conference, Mr. Thomassey advised the Court that Defendant was likely to enter a change of plea, which Defendant confirmed, and Mr. Thomassey also stated that he was no longer seeking to withdraw as counsel in this matter. (Docket No. 29). Consequently, the Court set a change-of-plea hearing for May 20, 2010. (*Id*.). However, the Court expressly ordered that it would not rescind the Pretrial Order nor the attendant deadlines and hearings at that time. (Docket No. 29). Thus, the matter remained set for trial on June 1, 2010.

Prior to the change-of-plea proceeding, Defendant had certain correspondence with his counsel, Mr. Thomassey. In a letter to Defendant dated May 10, 2010, Mr. Thomassey wrote:

> Dear Rich:
>
> I received your letter of May 3, 2010. All of the things that you talk about in your case are mitigation factors in sentencing. They do not go to guilt of [sic] innocence. I can tell you this; you are walking a very fine line here with this Federal Judge. You stood in front of her several weeks ago and told her that this case was settled and that you were going to enter a plea on May 20, 2010. If you change your mind now, in my opinion, she is going to immediately put you in jail and set a trial date in July or August. You cannot do this going back and forth. I have been practicing criminal law for thirty-five years and I am telling you that there is no way to win your case. You either have to fire me, apply for a Public Defender, or not show up for court. Those are your three options at this point. We have told the Judge that you are going to plead guilty on May 20, 2010 and then be sentenced sometime around five months later. That is still my best advice for you and you should follow it.
>
> Very Truly yours,
>
> *s/Patrick Thomassey*

(Docket No. 70-1).[6]  In advance of the proceeding, on May 11, 2011, the Court received a fax from Thomassey's office containing a version of the plea letter executed by both Thomassey and Defendant.  (Ct. Ex. 2).  The material terms of the agreement are the same as the version that was ultimately executed in court, including the final passage wherein Defendant agrees that he had reviewed the agreement with his attorney and that no additional promises or representations were made to induce his plea.  (*Id*.).

On May 20, 2010, Defendant pled guilty to one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, at Count One of the Indictment, pursuant to a written plea agreement with the Government, which was fully executed during the proceeding.  (*See* Docket No. 31).  At the change-of-plea proceeding, the Court engaged in an extensive colloquy with Defendant as required under Rule 11, including questioning Defendant regarding his understanding of the plea agreement, the charges against him, the potential penalties, and the constitutional rights he was waiving as a result of his guilty plea.  (*See generally Trans. 5/20/10 Hr'g*).  The Court found that Defendant's plea was knowingly and voluntarily made and accepted it.  (*Id*. at 31-32).

The material terms of the plea agreement included the following.  Defendant agreed to: plead guilty to Count One of the Indictment; pay mandatory restitution under the Victim-Witness Protection Act, 18 U.S.C. §§ 3663, 3663A and 3664; pay a special assessment of $100 to the Clerk of Court; and waive his right to appeal his sentence and to file a motion to vacate or other collateral attack on his sentence.  (Docket No. 32).  In exchange, the Government agreed to stipulate that the loss associated with Defendant's criminal conduct was between $400,000 and $1,000,000, resulting in an adjusted offense level of 21 under U.S.S.G. §§ 2B1.1 and

---

[6]  The Court notes that Defendant's May 3, 2010 letter referenced by Mr. Thomassey has not been filed of record nor was it admitted during the February 8, 2011 motion hearing.

2B1.1(b)(1)(H), and that said offense level should be reduced by 3 levels under U.S.S.G. § 3E1.1

for acceptance of responsibility, for a total offense level of 18.  (*Id*.).  The plea agreement further

states that

> [t]his letter sets forth the full and complete terms and conditions of
> the agreement between Richard Shumaker and the United States
> Attorney for the Western District of Pennsylvania, and there are no
> other agreements, promises, terms or conditions, express or
> implied.

(*Id*.).  Also, Defendant and his counsel executed the plea agreement directly below the following

passage:

> I have received this letter from my attorney, Patrick Thomassey,
> Esquire, have read it and discussed it with him, and I hereby accept
> it and acknowledge that it fully sets forth my agreement with the
> Office of the United States Attorney for the Western District of
> Pennsylvania.  I affirm that there have been no additional promises
> or representations made to me by any agents or officials of the
> United States in connection with this matter.

(*Id*.).

At the time of his plea, Defendant was 68 years old, had attained a bachelor's degree and

completed real estate courses necessary to work as a mortgage broker.  (*Trans. 5/20/10 Hr'g* at

3-4).  He had no difficulty communicating with his attorney or the Court.  (*Id*. at 4).  He averred

that he was not under the influence of drugs or alcohol nor was he under the care of a physician,

therapist, psychologist or psychiatrist.  (*Id*. at 4-5).  Defendant stated that he fully understood the

proceedings; his counsel opined that Defendant was competent to plead; and the Court found that

Defendant was competent to meaningfully participate in the proceeding based on his response to

the Court's questions and his demeanor in the courtroom.  (*Id*. at 5).  In this Court's estimation,

Defendant is a sophisticated individual, who engaged in a complicated fraud against a large

financial institution, and clearly had the mental capacity and ability to understand the nature and circumstances of the proceedings and the consequences of his guilty plea.

As part of this proceeding, Defendant indicated that he was satisfied with the representation that Mr. Thomassey had provided to him and understood the charges against him. (*Id.* at 6-7). Defendant further indicated that he understood all of the material terms of his plea agreement with the Government and acknowledged his endorsement of the plea agreement. (*Id.* at 9-10). After hearing the Court's recitation of the constitutional rights and protections that would be lost if he pled guilty (*id.* at 17-21), along with the government's summary of the elements that it would have been required to prove beyond a reasonable doubt and a summary of the government's evidence (*id.* at 25-28), Defendant stated that he still wished to plead guilty (*id.* at 29), which he acknowledged was voluntary and the product of his own free will (*id.* at 29-31). Specifically, the Court engaged in the following colloquy:

> THE COURT: Mr. Conway, what, in summary, would be the government's evidence as to the charge at Count 1 against Mr. Shumaker?
>
> MR. CONWAY: Your Honor, if the defendant were to choose to go to trial in this case, we would present evidence that he was involved in a conspiracy to defraud American Express. The fraud involved submitting applications to American Express for credit cards that did not include all the accurate information with regard to the applicants['] financial condition.
>
> We would present evidence that the purpose of this scheme was to get a bunch of American Express accounts, and then, a merchant account associated with it. And the idea was to, for example, on day one, charge a bunch of services to the American Express business card accounts, receive the payments for them, and then use money from subsequent credit card purchases to pay off the bills. So, it was sort of a running scheme in which they were using money from the scheme to repay liabilities incurred earlier.

In connection with this, Mr. Shumaker paid an individual named Larry Konter approximately $5,000 to open up various accounts that were used in connection with the scheme. In addition, he had an individual named Susan Fawcett, who opened accounts as the merchant, essentially, and she, at Shumaker's direction, according to her, prepared fraudulent invoices, falsely representing that she had done services for a different company, and then, submitted those requests for payment for those services through the interstate wires to American Express. Once those moneys -- once she received moneys from American Express, those funds would then, in turn, be provided to Mr. Shumaker.

In addition, Miss Fawcett, according to her, and according to the evidence that we would present, used a false name, used her maiden name and variations of her own name in connection with this scheme, which was really designed to avoid internal controls that would have otherwise caught the fraud. American Express had certain internal accounts, where the merchant account couldn't, and the actual account holder couldn't be the same person, essentially. So there were false representations made to American Express to avoid that internal control. They may have otherwise captured the fraud.

In addition, Mr. Shumaker directed the payments to be made to American Express during the course of this that went through the United States mails. And eventually, the payments could no longer be made, they could no longer continue the operation, and I guess Mr. Shumaker was using some of the money from the scheme to pay for his own expenses. So eventually American Express shut the account down, and there was a substantial loss to American Express.

We did execute a search warrant in connection with this case. We found a lot of fraudulent invoices. We found e-mails implicating Mr. Shumaker in this conspiracy.

So, in summary, Your Honor, that would be the evidence that we would intend to present.

THE COURT: Thank you, Mr. Conway.

Mr. Thomassey and Mr. Shumaker, do you agree with the prosecution's summary of what Mr. Shumaker did? Anything you want to add or correct?

MR. THOMASSEY: No additions or corrections to the summary at this point, Your Honor. Thank you.

THE COURT: Okay. The Court then finds that there is, indeed, a factual basis to accept the defendant's plea of guilty to the offense charged at Count 1 in the indictment at Criminal No. 09-87.

Mr. Shumaker, having been advised of all of your rights, do you still wish to plead guilty, sir?

THE DEFENDANT: Yes, ma'am.

THE COURT: Mr. Thomassey, is this consistent with your advice?

MR. THOMASSEY: It is, Your Honor, very much so.

(*Id*. at 25-28).

After this extensive colloquy, the Court accepted Defendant's guilty plea and entered a judgment of guilt against him. (*Id*. at 31-32). Government counsel then notified the Court that the sentencing hearings for Fawcett and Konter could be scheduled, given that their testimony at trial against Defendant was no longer needed. (*Id*. at 36-37).

A Presentence Order was issued after the proceeding, setting forth presentence deadlines and scheduling Defendant's sentencing for September 17, 2010. (Docket No. 34). Then, on May 21, 2010, the Court issued an Order in Konter's case, scheduling his sentencing – which had been held in abeyance pending resolution of Defendant's case – for July 7, 2010. (Crim. No. 08-267, Docket No. 32). A continuance was granted and Konter's sentencing was held on July 29, 2010. The Court imposed the following sentence in Konter's case: 15 months of imprisonment; 3 years of supervised release with standard and additional conditions; restitution of $574,134.40; a $10,000 fine; and a $100 special assessment. (Cr. No. 08-267, Docket No. 54). The Court further ordered that Konter voluntarily surrender to the U.S. Marshal Service for

service of his sentence by no later than September 9, 2010.[7]  (*Id.*).  Susan Fawcett's sentencing

was held on August 12, 2010.  (Cr. No. 08-264, Docket No. 51).  The Court imposed the

following sentence in Fawcett's case: 5 years' probation with standard and additional conditions;

restitution of $574,134.40 and a $100 special assessment were ordered; a fine was waived.  (Cr.

No. 08-264, Docket No. 52).  The period of probation commenced forthwith.

     As directed by the Court's Presentence Order, (Docket No. 34), the Probation Office

prepared a Presentence Investigation Report ("PIR") for Defendant's case dated August 10,

2010.  (Docket No. 39).  The PIR included a detailed and thorough recitation of the offense

conduct in this case:

> ### The Offense Conduct
>
> 5.     This case involves a complex scheme to defraud American
> Express through the use of merchant accounts.  The Financial
> Crimes Task Force of Southwestern Pennsylvania conducted the
> investigation leading to the indictments in this case.
>
> 6.     Richard Shumaker has owned Wilmerding World Wide
> (WWW), which is a consulting business, since the mid-1990s.
> Shumaker was also affiliated with the following companies:
> Vasseur Maintenance, Vassuer Industrial, EC Barnes, East
> Pittsburgh Improvement Company, WIRC, Hamilton Development
> Company, New Era Technology, Digimax, and Hetrick.  Shumaker
> was a financial consultant who claimed that he could assist
> businesses in improving their cash flow, when in reality, his
> "assistance" amounted to a scheme that worked similarly to check
> kiting.
>
> 7.     Susan Fawcett was employed at CIS Office Installation and
> was also employed at WWW.  Fawcett was also the owner of
> Susan Fawcett and Associates, a consulting business which
> operated out of her residence.  Fawcett is the girlfriend of [JV],
> who is the owner of CIS Office Installations.  [YR] is a secretary at
> WWW.

---

[7]     Konter has appealed this Court's sentence, and his appeal remains pending.  (Cr. No. 08-267, Docket No. 58).  Prior to his self-report date Konter moved the Court for bond pending appeal, the Government objected, and the Court denied his motion.  (Cr. No. 08-267, Docket Nos. 65, 67, 70).  Thus, Konter is presently incarcerated.

8.     Essentially, Shumaker would have Susan Fawcett process a fake sale, in which no goods or services were provided.  American Express would send money to Shumaker.  They would later send a bill to Shumaker, who would pay the bill with the money received from the fake sale.  However, in between the first sale and the bill, Fawcett would have processed more fake transactions on a different business account associated with Shumaker.  Thus, he would receive more money from American Express.  The process would repeat itself time and time again.  However, Shumaker was spending some of the American Express money on rent, payroll, and other expenses and not paying all that he owed American Express; therefore, he ran up a huge debt to American Express before the Company realized that he was associated with multiple accounts.

10.     On June 21, 2006, a postal inspector with the United States Postal Inspection Service and an Allegheny County detective met with an American Express investigator regarding fraud involving an American Express employee.  The investigator related that a group of American Express accounts had recently been shut down by American Express for suspicious activity.  He stated the accounts in question were opened around the same time period and were only being used at one common American Express merchant terminal, that of Susan Fawcett and Associates.

11.     The investigator provided documentation detailing accounts belonging to WWW, CIS, EC Barnes, and others that were all utilized at the American Express merchant terminal of Susan Fawcett and Associates.   The American Express investigator stated that all of the accounts in question were opened by American Express salesman Larry Konter.  In addition, he stated Konter accepted payments into his PayPal account from Richard Shumaker, utilizing the same American Express accounts which Konter had helped set up.  The investigator further stated that Richard Shumaker, who is connected to all of the American Express accounts in question, is currently in legal proceedings with American Express for accounts opened by Vasseur Industrial and Vasseur Maintenance in 2002, which caused a loss of approximately $2,000,000 to American Express.  Larry Konter was responsible for setting up the Vasseur accounts connected to Richard Shumaker in 2002.

12.     On January 11, 2007, a postal inspector, an Allegheny County detective, and a Secret Service agent interviewed Susan Fawcett.  Fawcett informed them that she opened an American Express merchant account at the request of Richard Shumaker and

13

ran "hundreds of thousands of dollars" through the merchant account at Shumaker's request. Fawcett stated Shumaker was "cycling" funds from a number of American Express accounts and that "cycling" involved manipulating the monthly due dates associated with each of the American Express accounts to prolong actual payments. The investigation revealed this practice to be similar to check kiting, only using credit card accounts. Fawcett stated Shumaker's secretary, [YR], kept track of the cycling on a computer at the office of WWW. Fawcett informed them that Richard Shumaker opened American Express accounts for WWW, WIWR, EPIC, EC Barnes, and CIS. Fawcett stated Larry Konter assisted in setting up the accounts and told her to use fictitious names on the accounts to avoid suspicion from American Express. Fawcett did so in order to, on at least two occasions, avoid American Express' internal controls set up to avoid this type of fraud. She additionally created a fake invoice that she provided to Shumaker's secretary. Fawcett stated Shumaker would tell her to bill the accounts through her American Express merchant account, as if she had provided a good or service. She stated American Express would then pay her, and she would write a check to Shumaker for the amount of the transaction. She stated that she never provided any services for the transactions.

13.    On January 12, 2007, [JV] was interviewed. [JV] is the owner of CIS. He indicated that Shumaker introduced a way to generate cash for his business using American Express corporate business accounts by "cycling." He stated that although he ([JV]) completed the American Express account applications, Shumaker controlled the accounts and possessed the cards. He stated when he received an American Express bill for CIS, he would mail it to Shumaker. Shumaker would then provide him with a check to pay the bill, and [JV] would mail the payment to American Express.

14.    On February 20, 2007, investigators interviewed Shumaker. Shumaker stated he opened American Express corporate business accounts for EC Barnes, WWW, EPIC, WIRC, and CIS in 2005 to cycle the accounts. He stated he instructed Susan Fawcett to open an American Express merchant account to utilize the accounts connected to WWW, CIS, EPIC, etc. He admitted that there never were any legitimate services connected to the charges to the merchant accounts.

15.    On April 2, 2007, Shumaker's secretary, [YR], was interviewed. She stated that a credit card system was set up and that she worked with Fawcett on tracking four to five credit card cycles. She stated a cycle is a billing date that takes place at

different times each month. She stated that she maintained a spreadsheet on her computer for keeping track of the cycles.

16.     Based on the above information, a search warrant was conducted at Shumaker's business. Incriminating e-mails and other correspondence were seized.

17.     Shumaker is under investigation for the same type of scheme in Kentucky, where it is alleged that he caused a loss to American Express of over $2,000,000. The conduct which occurred in Pennsylvania, involves a loss of $574,134.40 to American Express.

(PIR at ¶¶ 5-17).[8] The PIR further details background information regarding the Defendant and the Probation Office's position as to the applicable statutory penalties, advisory guideline range, and the restitution owed by Defendant, among other things. (*See generally*, PIR).

The Government and Defendant both filed their positions regarding the PIR, indicating that <u>neither</u> had any objections to the PIR. (Docket Nos. 37, 38). The Probation Office then filed an Addendum to the PIR dated August 24, 2010, noting the lack of any objections by the parties. (Docket No. 41). The Court issued its Tentative Findings and Rulings on August 26, 2010, setting forth the applicable statutory penalties and its tentative guideline calculations. (Docket No. 42). Based on his conviction at Count One of the Indictment, Defendant is subject to the following statutory penalties: a maximum term of imprisonment of 20 years, a term of supervised release of not more than three years, a fine of $100, and mandatory restitution of $574,134.40. (*Id.*). In addition, the advisory guidelines provide for a sentence of 27-33 months imprisonment, followed by 2-3 years of supervised release and also a fine of $6,000 to $60,000. (*Id.*).

---

[8]     The Court notes that the facts set forth in the PIR are consistent with those facts set forth in Inspector Anderchak's Affidavit in Support of Search Warrant dated April 30, 2007. (Govt. Ex. 12).

Defendant's sentencing was originally scheduled for September 17, 2010. (Docket No. 34). However, by Order dated June 24, 2010, the sentencing was rescheduled for September 14, 2010, given the Court's judicial retreat. (Docket No. 35). Subsequently, on September 9, 2010, Defendant filed an unopposed motion to reschedule the sentencing date, citing as reasons interviews of Defendant by federal agents that had yet to occur and Mr. Thomassey's trial schedule. (Docket No. 43). The Court granted said motion and rescheduled the sentencing for November 23, 2010. (Docket No. 44). Thereafter, the Government filed an unopposed motion to continue the sentencing hearing, citing the Assistant U.S. Attorney's trial schedule as the basis for its motion. (Docket No. 45). As before, the Court granted this motion and again rescheduled the sentencing for December 14, 2010 at 9:00 a.m. (Docket No. 46).

Around October of 2010, Defendant began filing a series of motions, *pro se* and sending *ex parte* letters directly to the Court.[9] He filed an "emergency" motion to stay proceedings on October 25, 2010. (Docket No. 47). In his motion, Defendant complained about his counsel, that he had no access to certain documents in the possession of the Government which were relevant to his sentencing and lodged allegations against American Express as well as several other individuals. (*Id*.). The Court set a hearing on Defendant's "emergency" motion for December 8, 2010 and separately ordered that Defendant refrain from any further submissions given that he was represented by counsel at the time and that any future filings should be submitted to the Clerk of Court, rather than directly to the Court's Chambers. (Docket No. 49). Defendant did not abide by this Order and continued to make *pro se* filings. On December 3, 2010, Defendant submitted a motion to continue the hearing scheduled for December 8, 2010 and a motion to dismiss the case. (Docket Nos. 52, 53). Like his earlier submissions, these

---

[9]      His pleadings also indicated that Defendant had posted them and other materials online at http://www.ssres.com. However, the main page of that website is no longer active.

filings state Defendant's displeasure with Mr. Thomassey and indicated that he intended to request new counsel. (Docket No. 52-1). On December 4, 2010, the Court denied Defendant's motions separately for failure to comply with the Court's previous Order. (Docket Nos. 54, 55).

After the Court's December 4, 2010 rulings, and because of Defendant's numerous *pro se* filings, Mr. Thomassey filed a motion to withdraw his appearance on December 7, 2010. (Docket No. 57). The Court intended to address both Defendant's motion to stay and Mr. Thomassey's motion to withdraw at the December 8, 2010 hearing. However, Defendant failed to appear. (Docket Nos. 48, 54). Therefore, a warrant was issued for his arrest. (Docket Nos. 57, 58, 59). Defendant then made two more *pro se* submissions on December 10, 2010, a motion to continue his sentencing and a second motion to dismiss the case. (Docket Nos. 62, 63). Included with his filings was a letter addressed to Mr. Thomassey purportedly terminating his services and another letter to Government counsel, where Defendant also expressed his intent to obtain new counsel. (Docket Nos. 62, 63). With respect to his guilty plea, Defendant stated that "[i]n court in April after you submitted a motion to withdraw, I agreed to consider confession as long as I had the opportunity to read and consent to the settlement letter, plus you kept your promise to postpone sentencing one year to go after American Express." (Ct Ex. 14). The Court denied these motions for failure to comply with the previous Order. (Docket No. 64).

Mr. Thomassey reported to the Court during a previously scheduled telephone conference on December 10, 2010 that he had contacted Mr. Shumaker and advised him that a warrant was issued for his arrest given his failure to appear. (Docket No. 68). The Court further advised that the sentencing hearing set for December 14, 2010 may be converted to a motion hearing in the event that Defendant was detained pursuant to the warrant and/or appeared. (*Id*.).

Defendant appeared for the proceeding on December 14, 2010. (Docket No. 68). At the hearing, the Court heard Defendant's position regarding his failure to appear and as to Mr. Thomassey's motion to withdraw as counsel. (*Id*.). The Court granted Mr. Thomassey's motion to withdraw and appointed new counsel for Defendant, James Brink, Esquire. (Docket No. 67). Mr. Brink appeared later that day and met with Defendant. (Docket No. 68). The Court then reconvened and, after hearing the parties' positions, entered an order amending Defendant's bond conditions, which permitted him to continue to reside in Florida but required him to make more frequent contacts with Pretrial Services. (*Id*.; Docket No. 69). The Court also withdrew the outstanding bench warrant. (Docket No. 69).

The matter then was set for sentencing on February 8, 2011. However, in the interim, Defendant, through counsel, filed the pending motion to withdraw his guilty plea and a motion to continue sentencing. (Docket Nos. 70, 71). The Government filed responses opposing both of Defendant's motions on January 24, 2011. (Docket Nos. 74, 75). Defendant, again through counsel, filed a reply brief wherein he reiterated his request that a hearing be held on his motion to withdraw his guilty plea. (Docket No. 76). At a status conference on January 28, 2011,[10] the Court heard brief argument regarding whether a hearing was necessary and also inquired with counsel regarding the status of the case. (Docket No. 79). The Court ordered that the sentencing hearing scheduled for February 8, 2011 be converted to a motion hearing wherein the Court would accept evidence regarding Defendant's motion to withdraw plea. The Court expressed her displeasure with the lack of preparation by the defense in the six weeks from the previous hearing and ordered that Defendant immediately deliver all evidence he intended to present at the motion hearing to counsel and that defense counsel immediately meet with Government counsel to review all Rule 16 materials. (Docket No. 80). The Court also ordered Defendant to appear in

---

[10]      Defendant was permitted to appear via telephone for this proceeding.

person. (*Id.*). Defendant's sentencing has been held in abeyance pending the resolution of the present motion to withdraw his guilty plea.

### b. *Evidence Presented at the February 8, 2011 Motion Hearing*

The Court held a motion hearing on February 8, 2011. (Docket Nos. 81, 84). Defendant was the only witness presented by the defense and the Government did not call any witnesses. (*Id.*). However, documentary exhibits were entered into evidence by Defendant, the Government during cross-examination and the Court during its questioning.[11] (Docket No. 81-1).

At the outset of the hearing, the Court detailed the background of the case and asked Defendant standard competency questions. (Docket No. 84 at 3-12). He appropriately answered the Court's questions and the Court was satisfied that he was competent to proceed during the hearing. (*Id.* at 12). As Defendant's credibility was squarely at issue in this proceeding,[12] the Court carefully reviewed his demeanor and conduct on the witness stand throughout his testimony, particularly in light of his demeanor and conduct before the Court on prior occasions.

---

[11]      Near the conclusion of the hearing, Defendant lodged an objection to the Court's alleged extrajudicial investigation into the civil proceedings in Kentucky and the Western District of Pennsylvania. (Docket No. 84 at 147, 148). Said objection was overruled. The Court found that it could take judicial notice of the court filings in order to ascertain the status of these matters. Pursuant to Rule 201(b) a court may take judicial notice of any fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). To this end, a court may take judicial notice of a prior judicial opinion and matters of public record, including court filings. *See McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009). The documents submitted by the Court were all filed of public record and the Court's inquiry into same was raised in reference to Defendant's *pro se* submissions, the undisputed facts set forth in the Presentence Investigation Report and the evidence presented at the February 8, 2011 hearing. For example, Defendant's *pro se* submissions contained numerous references to the Kentucky case and the Presentence Investigation Report indicates that the matter is ongoing. Multiple decisions by the district judge in that case are available publicly through Westlaw and Lexis. The Court merely reviewed the docket report of the case in the Western District of Kentucky to ascertain the present status of the matter. Defendant also introduced a portion of a civil complaint filed in the Western District of Pennsylvania against the Vasseurs. As to this case, the Court searched the docket report and printed the entire complaint rather than the portion submitted by Defendant. Finally, the other Court exhibits to which exhibits were made were *pro se* letters submitted by Defendant himself directly to Chambers. Thus, the Court engaged in no investigation as to these exhibits except to open its mail and read the contents. Moreover, counsel was supplied with copies of these documents which Defendant had submitted directly to the Court.

[12]      *See* § III.A, *infra*.

Considering the entire record,[13] the Court did not find Defendant's testimony to be credible regarding multiple material points. To this end, the Court rejects Defendant's testimony that contradicted his statements at the change-of-plea hearing and his prior statements to Inspector Anderchak as stated in two memoranda of interviews. (*See Tran 5/20/10 Hr'g*; Govt. Ex. 1, 2). The Court further disregards Defendant's testimony to the extent it conflicted with Inspector Anderchak's sworn affidavit in support of the search warrant. (*See* Govt. Ex. 12).

In general, Defendant did not appear truthful at the motion hearing. When difficult questions were posed, he often took long pauses, closed his eyes and put his hand on his forehead. He also clenched his jaw at times when the Court turned to directly observe his answers. At one point during the hearing, he claimed he could not read with his glasses on, despite the fact that he had read other documents with his glasses on throughout the hearing. (Docket No. 84 at 84). He also needlessly contested whether a fax number listed on many of the documents presented by the Government was his office fax number; however, many of the documents, including his correspondence with his attorneys in this case, are stamped with the same fax number and marked as sent by his company, Wilmerding World Wide. (Docket Nos. 84 at 79, 81, 117-18; 70-1; Ct. Ex. 2). Indeed, the copy of the May 10, 2010 letter from Mr. Thomassey to Defendant that is filed with the Court– the critical document supporting his motion to withdraw plea -- is stamped as sent from Wilmerding World Wide at the same number to the fax number of his current counsel, James Brink, Esq.[14] (*See* Docket No. 70-1). Throughout, he

---

[13]    The Court considered the change-of-plea colloquy and all of the Exhibits admitted into evidence, including, but not limited to, the two memoranda of interview prepared by Inspector Anderchak and his sworn affidavit in support of the search warrant. (Govt. Ex. 1, 2, 12; Docket No. 81-1, Exhibit List).

[14]    Likewise, the final page of Court Exhibit 2, which is a fax received by the Court from defense counsel Patrick J. Thomassey, Esquire on May 11, 2010 containing an executed version of the plea agreement forwarded in advance of the change-of-plea proceeding, is marked with the same fax number and identified as being sent by Wilmerding World Wide. (Ct Ex. 2). Defendant's Wilmerding World Wide letterhead reflected the same fax number.

failed to present any convincing and corroborating evidence to support much of his testimony. As a whole, Defendant's testimony was at best, inconsistent; at worst, incredible. With this backdrop, the Court turns in more detail to Defendant's testimony.

The Court questioned Defendant why he wished to withdraw his guilty plea and he responded stating that he did not feel that he was guilty, that he was put in a position to confess and ultimately, was coerced into confessing. (Docket No. 84 at 12). Defendant explained that he retained Mr. Thomassey to represent him shortly after the indictment was filed, on March 11 or 12 of 2009. (*Id*. at 16-18). He paid Mr. Thomassey $11,000 of the $20,000 he required for the services provided in this case.[15] (*Id*. at 16). The two had an initial consultation about a week before his May 31, 2009 arraignment. (*Id*. at 18). Defendant flew to Pittsburgh from his home in Florida for the meeting and they met for approximately 45 minutes. (*Id*.). Mr. Thomassey reviewed the indictment with him. (*Id*.).

Mr. Thomassey represented Defendant at his arraignment, when he pled not guilty.[16] Defendant testified that he was not aware that subsequent to his arraignment, Mr. Thomassey had filed six motions for extension of time to file pretrial motions, but then immediately contradicted himself and testified that he was sent a letter from Mr. Thomassey explaining that pretrial motions were due. (*Id*. at 19-20). He also testified that he and Mr. Thomassey had further correspondence via an exchange of letters, including that he was advised that Larry Konter was prepared to testify against him; however, he did not present any of the letters to corroborate or substantiate his testimony. (*Id*. at 20-22). He only presented the May 10, 2010 letter from Thomassey to him, which is detailed above. (*Id*. at 23; 70-1; Def. Ex. A). In addition, he

---

[15]     The Court notes that there was no evidence presented suggesting that Mr. Thomassey has brought a claim or lawsuit against Defendant to collect the outstanding balance.

[16]     Rule 16 materials were provided to the defense at the arraignment. *See* p. 5, *supra*.

admitted that a plea agreement letter offered by the Government was forwarded to him by Thomassey during this exchange. (*Id*. at 20). Despite stating that they had no contact, Defendant also detailed a heated telephone exchange between him and Mr. Thomassey during which he was advised –consistent with the aforementioned letter—that he cannot win this case. (*Id*. at 25-6).

Defendant further testified that Thomassey conducted little or no investigation of the facts of this case and did not take the time to review the evidence the Government intended to present against him. (*Id*. at 20-26). However, Defendant later admitted that Thomassey had advised him: that Larry Konter and Susan Fawcett were prepared to testify against him; of the contents of the affidavit supporting the search warrant of his office and of two interviews of him by Agent Anderchak; of the terms of the plea agreement and, the fact that the Kentucky lawsuit was potentially damaging to his case here. (*Id*. at 20-22; 46; 62-64; 106-108; 128; 148-150; Govt. Ex. 1, 2, 12; Ct. Ex. 5).

Regarding the May 10, 2010 letter, Defendant testified that he believed that he had no option but to plead guilty and that he would be put in jail if he changed his mind and requested a trial date. (Docket No. 84 at 25-6). He boldly stated that he did not tell the truth at the change-of-plea hearing on May 20, 2010. (*Id*. at 26-7). Instead, he explained that he lied during the change-of-plea hearing:

> Because of the three options that I felt were in front of me. I was either going to go to jail or confess or I had to run away or flee whatever the case may be and I wasn't going to do that obviously.

(*Id*. at 27). Defendant also testified that he signed the plea agreement which stated that he accepted responsibility for losses between $400,000 and $1,000,000, but had never received an

itemization of the alleged losses of $545,000 set forth in the PIR.  (*Id*. at 28-29).  He further

stated that:

> I admitted to that amount for the same reason that I confessed
> because, in my mind, I had no choice.  That amount, in my mind,
> was absolutely wrong and I tried to discuss during the confession
> certain points with Mr. Thomassey while I was sitting back there
> and he waved me off and basically said answer the judge yes or no,
> whatever the case may be.  He basically said just leave me alone.[17]

(*Id*. at 29).

Defendant then testified that he was not guilty of the offense.  (*Id*. at 30).  He opined that

the Kentucky matter which he was involved in with the Vasseurs and their companies had a

"great deal of bearing" on the present criminal action in Pennsylvania.  (*Id*. at 30-31).  Defendant

explained this with background information regarding the start of his business relationship with

the Vasseurs.  (*Id*. at 31-35).  Through his company, Wilmerding World Wide, he assisted the

Vasseurs in factoring their accounts receivables, obtaining a line of credit and a number of credit

cards with American Express from approximately 2002 through 2004.  (*Id*.).  Larry Konter was

the representative of American Express with whom Shumaker set up the accounts.  (*Id*. at 33).

The Vasseurs defaulted on the credit cards resulting in debts of approximately $2.6

million to American Express.  (*Id*. at 35).  Initially, American Express took actions to collect the

debt from the Vasseurs through him; including sending collection letters to him and serving him

---

[17]	The record does not reflect such as set forth in the following exchange at the change-of-plea hearing.

> THE COURT: Have you been instructed by your attorney, the attorney for the
> government, or anyone else to respond untruthfully to any question about a
> promised sentence?
> THE DEFENDANT: No, ma'am.
>                         …
> THE COURT: So, you are voluntarily and of your own free will planning to
> plea?
> THE DEFENDANT: Yes, ma'am.

(*Trans 5/10/20 Hr'g* at 30-31).

with a lawsuit filed against the Vasseurs in the Western District of Pennsylvania at Civil Action Number 05-200 at his business address.[18] (*Id*. at 131-134; Def. Ex. C; Ct Ex. 4, 7).  In 2007, American Express instituted a civil action against Defendant and the Vasseurs in the United States District Court for the Western District of Kentucky in order to collect the debt.  (Docket No. 84 at 138-143).  That lawsuit remains ongoing.  (*Id*. at 142-43).

In 2005, subsequent to the Vasseurs' default but prior to the initiation of the Kentucky lawsuit, Defendant set up credit card accounts with American Express for a number of entities that he operated or was associated with including Wilmerding World Wide, E.C. Barnes, CIS and Hetrick.  (*Id*. at 35-36).  He opened "probably a dozen" credit card accounts.  (*Id*. at 37).  Larry Konter again was the representative from American Express who set up the accounts. (*Id*.).  Defendant admitted that he directly paid Konter $5,000 on a number of occasions, but denied that these payments were to set up the accounts.  (*Id*. at 93-95).  The Court does not find this denial believable.

The accounts were opened after Defendant filed applications for same along with financial statements or tax returns in support.  (*Id*. at 36-38).  Defendant maintained that because American Express was familiar with him from the Vasseurs' deals, including individuals from the risk management and legal departments, that his applications should have been thoroughly vetted, undermining the Government's position that they were fraudulent.  (*Id*. at 42-58).  To this end, he initially testified that the applications submitted to American Express were not fraudulent.  (*Id*. at 36-38).  But, after the Government confronted him with the applications and supporting financials, Defendant changed his testimony regarding their fraudulent nature and ultimately admitted that the revenues and net income on the financial statements were overstated

---

[18]     Shumaker contended that he was not the Vasseur's agent.  He later testified that he was a representative of the company and finally admitted that he held the title of Chief Financial Officer.  (Docket No. 84 at 133).

and inconsistent with his prior statements to Investigator Anderchak that his companies only made $10,000 per year. (*Id*. at 67-71, 72-86; Govt. Ex. 6, 7, 8). He also admitted that he provided no real goods or services in exchange for the "credit services income" he claimed to have earned on his company's financial statements. (*Id*.).

As to the usage of the accounts, Defendant admitted that he "factored" the various accounts, running up large balances on all of them in an effort to pay off past debts and then using the balance available on each card to pay off the amount due on the other cards. (Docket No. 84 at 36-39, 87-88). He suggested that this "factoring" could continue indefinitely but the account was closed by American Express due to the fraud investigation. (*Id*. at 39-41). He explained that he directed Susan Fawcett to produce invoices. (*Id*. at 86-89). He further testified that Fawcett did not provide goods or services sufficient to support the transactions initially run through the accounts which supported the high balances on each account. (*Id*. at 90-93). After a pause and with some trepidation, he eventually admitted that the invoices presented by the Government indicating that she provided $41,560.00 of tax software training, tax software implementation and document preparation to Defendant's East Pittsburgh Improvement Company between March 5, 2006 and March 24, 2006 were fraudulent. (*Id*. at 90-93; Govt Ex 3). In addition, after being presented with damaging emails by the Government, he admitted that he was aware that Susan Fawcett had lied to American Express investigators about a fake name associated with one of the accounts which she had opened. (Docket No. 84 at 96-104; Govt. Ex. 4). Defendant attempted to explain that he was not aware of this aspect of the fraud, but considering that he took no steps to alert American Express of Fawcett's fraudulent dealings, and the rest of his fraudulent conduct, this Court finds that his testimony on this point was not credible. (*Id*.).

c. *The Alleged Kentucky Conspiracy and Related Civil Proceedings*

As noted, throughout his *pro se* submissions in this case, and during his testimony,

Plaintiff has repeatedly referenced a civil action pending against him in the United States District

Court for the Western District of Kentucky.  On February 16, 2007, Corporate Services, a

business unit of American Express Travel Related Services Company, Inc. ("American

Express") initiated a civil lawsuit against a number of individuals and entities, including

Defendant and his company, Wilmerding World Wide, Inc. at Case Number 5:07CV-24-R.  (*Id.*

at 139).  As stated by the District Court in a recent decision, in that action, American Express

alleges that:

> from 2002 to 2004 Defendant Richard Shumaker masterminded [a
> credit card "factoring" scheme] with accomplices Gayle Vasseur,
> Janet Vasseur, their companies Vasseur Maintenance &
> Construction, Inc. ("VMCI") and Vasseur Industrial Services, Inc.
> ("VSI"), and Larry Stinson. Shumaker allegedly caused VMCI and
> VIS to amass millions of dollars in credit card charges on their
> American Express corporate accounts. Virtually all of those credit
> card charges were processed through two American Express
> merchant accounts, one set up in the name of Wilmerding World
> Wide, Inc. ("WWW") and the other in Stinson's name. Plaintiff
> claims that WWW was a "front" owned, controlled, and dominated
> by Shumaker. WWW and Stinson's merchant accounts were
> allegedly used by Defendants to obtain cash from American
> Express while artificially inflating their credit stature, even though
> no goods or services were being provided. Plaintiff seeks
> $2,604,861.16 in unpaid charges and outstanding balances on
> Defendant's corporate American Express credit card accounts.

*Corporate Services v. Shumaker*, 2010 WL 4340599, at *1 (W.D.Ky. Oct. 27, 2010).  This

alleged scheme is similar in nature to the instant criminal case but involved different individuals,

companies and most of the alleged conduct occurred in the Kentucky area.[19] The matter was

stayed for some time as the Vasseurs feared criminal prosecution for their alleged involvement

---

[19]     Defendant testified that Konter was involved in the Kentucky matter, but he is not a party to the lawsuit.
(Docket No. 84 at 33, 120).

26

and raised their Fifth Amendment rights to self-incrimination in opposition to discovery. The stay of the case was then lifted after Defendant was indicted in this criminal case in the Western District of Pennsylvania, while the Vasseurs apparently have not been indicted nor charged with any crimes, to this Court's knowledge. (Docket No. 84 at 34, 122; W.D. Ky. Civ. A. No. 05:07-cv-00024-TBR-DW, Docket No. 74). Defendant was initially represented by counsel in this civil case, but discharged his attorney on August 18, 2009 and has since represented himself *pro se*. (Docket No. 84 at 139, 141).

Despite the fact that the case was initially filed in 2007, Defendant has successfully avoided responding to American Express's discovery requests to this point. He has produced very little documentation to American Express and failed to attend his deposition, which appears to have been scheduled numerous times. (Docket No. 84 at 140). In that action, Defendant has raised arguments similar to those that he has advanced in this criminal case, i.e., that he does not have access to the documents in possession of the United States Attorney's Office for the Western District of Pennsylvania. (Docket No. 84 at 141-142; W.D. Ky. Civ. A. No. 05:07-cv-00024, Docket No. 167). Additionally, he has argued that he could not appear for his deposition outside of Florida due to his bond conditions. (*Id.*).

Recently, Magistrate Judge David Whalen ordered that Plaintiff produce documents to American Express by January 15, 2011 and that he be compelled to sit for his deposition, in Florida, by January 31, 2011. (Docket No. 84 at 142; W.D. Ky. Civ. A. No. 05:07-cv-00024, Docket No. 177). Defendant still seemingly refuses to make any real attempt to produce the documents. As a consequence, American Express has filed a motion to continue the deposition, extend the period of discovery and for sanctions against Defendant for his failure to participate in discovery. (W.D. Ky. Civ. A. No. 05:07-cv-00024, Docket Nos. 181, 183, 185, 186, 189).

Meanwhile, Government counsel in this case has repeatedly advised that the documents are available to the Defendant if he would simply appear to review them and Defendant has never moved this Court to amend his bond conditions in order to leave the state of Florida and appear for his deposition. (*See generally* Cr. No. 08-97; *see also* Docket No. 51). Defendant's appointed counsel in this case, Mr. Brink, has also advised American Express's counsel that Defendant will not participate in his deposition due to the pending motion to withdraw his guilty plea filed in this Court. (Docket No. 84 at 141; W.D. Ky. Civ. A. No. 05:07-cv-00024, Docket No. 186 at 2).

Upon review, Defendant's multiple recent *pro se* filings in Kentucky to stay and/or dismiss that case contain virtually the same allegations as those filed in this criminal action. (W.D. Ky. Civ. A. No. 05:07-cv-00024, Docket Nos. 148, 150, 153, 167). And, as here, it appears that the number of filings increase as deadlines and/or court appearance dates approach. (*Compare id. with* Docket Nos. 47, 52, 53, 62, 63). In each instance, the Defendant undoubtedly seeks to delay the inevitable.

## III. DISCUSSION

Pursuant to Rule 11(d)(2)(b) of the Federal Rules of Criminal Procedure, "a defendant may withdraw a plea of guilty or *nolo contendere* … after the court accepts the plea, but before it imposes sentence if … the defendant can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. P. 11(d)(2)(b); *see also United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005) ("if a motion for withdrawal of a plea of guilty or *nolo contendere* is made before a sentence is imposed … the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason."). However, "withdrawal of a guilty plea is not an absolute right," *Wilson*, 429 F.3d at 458, and, "once accepted, a guilty plea may not automatically be

withdrawn at the defendant's whim." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001) (citing *United States v. Martinez*, 785 F.2d 111 (3d Cir. 1986)). "The burden of demonstrating a 'fair and just' reason [for withdrawal of a guilty plea] is on the defendant, and that burden is substantial." *United States v. Scott*, Cr. No. 08-17, 2010 WL 2680368, at *1 (W.D.Pa. Jul. 6, 2010) (citing *Jones*, 336 F.3d at 252).

"The determination of a motion to withdraw a guilty plea is committed to the sound discretion of the district judge." *United States v. Schwartz*, 2010 WL 5078240, at *1 (3d Cir. 2010) (citing *Martinez*, 785 F.2d 111, 114 (3d Cir. 1986)). The Court of Appeals has directed that this Court consider the following three factors in order to evaluate whether a defendant has presented a fair and just reason for withdrawing a plea of guilty: (1) whether the defendant asserts his innocence; (2) whether the defendant proffered strong reasons justifying the withdrawal; and (3) whether the government would be prejudiced by the withdrawal. *United States v. King*, 604 F.3d 125, 139 (3d Cir. 2010) (citing *Martinez*, 785 F.2d at 114)).

    a. *Assertions of Innocence*

With regard to the first factor, this Court must "examine whether the defendant has asserted his or her factual innocence." *United States v. Brown*, 250 F.3d 811, 818 (3d Cir. 2001). This Court need not accept "bald assertions of innocence" by a criminal defendant. *Id.* Instead, a defendant's "assertions of innocence must be buttressed by facts in the record that support a claimed defense." *Id.* In addition, the defendant must present "sufficient reasons to explain why contradictory positions were taken before the district court." *Id.* (quoting *United States v. Jones*, 979 F.2d 317, 318 (3d Cir. 1992)).

It is generally appropriate for the Court to weigh the credibility of conflicting evidence and, in particular, to weigh any evidence presented by Defendant against his earlier sworn

statements made during the change of plea colloquy.  *See United States v. Jones*, 336 F.3d 245, 254 (3d Cir. 2003).  To this end, "[s]olemn declarations in open court carry a strong presumption of verity."  *Schwartz*, 2010 WL 5078240, at *2 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).  Indeed, Defendant asserted during the plea colloquy that he understood that his sworn statements were made under the penalty of perjury.[20]

Defendant now claims that he is innocent of the charge against him.  His appointed counsel argues that Defendant has "consistently and vehemently stated … that he is not guilty of the offense to which he pleaded guilty" after his appointment in December of 2010. (Docket No. 70).  Defendant offered testimony and presented several documents at the February 8, 2011 hearing, which he purports demonstrate his innocence in the instant fraudulent scheme.  (*See* Def. Ex. C, D).  He further claimed that he did not have the capacity to be the mastermind or ringleader heading the conspiracy, but points to other individuals, entities and American Express as the true leaders of the criminal conspiracy.  In this Court's estimation, and for the reasons set forth below, Defendant's testimony and documentary evidence do not support his innocence.

Defendant's claim of innocence is undermined by the fact that Defendant clearly and unequivocally admitted his guilt to his role in the instant conspiracy, both by executing his plea agreement with the Government and in his sworn statements made during the change-of-plea

---

[20] The Court notes that the crime of perjury is codified at 18 U.S.C. § 1623, which provides that:

> Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1623.

hearing.  (*See Tr. 5/20/10 Hr'g*; Docket No. 32; Ct. Ex. 2).  Also, in his letters to Thomassey, he

said that he would confess.  (Ct. Ex. 5, 12, 13, 14).

At the February 8, 2011 hearing, Defendant was examined by his current counsel

concerning these events:

> MR. BRINK:  Okay.  So you came in before this Judge to a hearing on May 20th, 2010?
>
> THE DEFENDANT: Yes.
>
> MR. BRINK:  You raised your right hand?
>
> THE DEFENDANT: Yes.
>
> MR. BRINK:  And you swore to tell the truth?
>
> THE DEFENDANT: Yes.
>
> MR. BRINK:  Mr. Thomassey was with you?
>
> THE DEFENDANT: Yes.
>
> MR. BRINK:  Did you tell the truth to this Judge at that hearing?
>
> THE DEFENDANT: No.
>
> MR. BRINK:  Did you tell this Judge that what you – that you committed a crime?
>
> THE DEFENDANT:  Yes, I did.
>
> * * *
>
> MR. BRINK:  Now, as part of [your] guilty plea – well, you signed the plea agreement?
>
> THE DEFENDANT:  Yes.
>
> MR. BRINK:  And your signature is on it?
>
> THE DEFENDANT:  Yes.
>
> MR. BRINK:  Mr. Thomassey's signature is on it?

THE DEFENDANT: Yes.

MR. BRINK: Mr. Conway's signature is not on it but the acting U.S. Attorney's signature was on it?

THE DEFENDANT: Yes.

MR. BRINK: And in that plea agreement you agree to accept responsibility for a certain sum of money?

THE DEFENDANT: Yes.

MR. BRINK: What was that sum of money?

THE DEFENDANT: Between $400,000 and a million, I believe.

MR. BRINK: Was there a specific number they had in mind that they believed that you defrauded American Express out of?

THE DEFENDANT: According to the presentence report, it was $545,000 and some change.[21]

(Docket No. 84 at 27-28). Later during the hearing, Defendant was explicitly asked whether he had provided the Court with false testimony:

MR. BRINK: Mr. Shumaker, you told this judge that you gave false testimony at your plea hearing. That's what you told this Judge?

THE DEFENDANT: Yes.

(*Id.* at 30).

Within the context of the instant motion, this Court sits as the trier of fact and is tasked with resolving factual disputes and assessing the credibility of witnesses. *See Jones*, 336 F.3d at 253-54. As such, the Court can accept some parts of Defendant's evidence and reject others. *Porter v. King*, Civ. No. 04-1228, 2009 WL 2407840, at *8 n.8 (W.D. Pa. Aug. 3, 2009) (stating the general definition of a "factfinder" presented for purposes of a non-jury trial). The Court may also "assess credibility in light of the maxim, *falsus in uno, falsus in omnibus* … defined as

---

[21]     At the motion to withdraw hearing, Defendant admitted that he reviewed the PIR. (Docket No. 84 at 129).

'false in one thing, false in everything.'" *Id.* (quoting *Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3d Cir. 1991), *which quoted* BLACK'S LAW DICTIONARY 543 (5th ed. 1979)). Despite Defendant's attempts to explain his conflicting testimony, his admission that he gave false testimony throughout his plea hearing "severely impacts, if not destroys, his credibility." *See United States v. Wallace*, Crim. No. 94-2, 1995 U.S. Dist. LEXIS 12647, at *15 (N.D. Ind. July 13, 1995). Moreover, the record is markedly devoid of evidence to support Defendant in his more recent affirmations of alleged innocence. In fact, in this Court's review of Defendant's proffered exhibits, not a single one speaks to Defendant's innocence of the relevant charge and the majority of said exhibits do not even pertain to the instant criminal action.[22] (*See* Def. Ex. A-D). Therefore, the Court credits Defendant's previously sworn statements over his statements to his newly appointed counsel—who did not enter his appearance in this case until 7 months after the May 20, 2010 hearing—and those made later to the Court at the February 8, 2011 hearing, where Defendant was noticeably evasive when it suited him.

In making this determination, the Court notes that it conducted a lengthy colloquy with Defendant at the May 20, 2010 hearing in accord with Rule 11 of the Federal Rules of Criminal Procedure. Rule 11(b) provides as follows:

> (b) Considering and Accepting a Guilty or Nolo Contendere Plea.
>
> (1) Advising and Questioning the Defendant. Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, the following:

---

[22]    In this regard, it appears that Defendant's Exhibits C and D, which were admitted at the February 8, 2011 hearing, relate exclusively to conduct that forms the basis of the civil action which is pending against Plaintiff in the United States District Court for the Western District of Kentucky. *Corporate Services v. Shumaker*, Civ. No. 07-24 (W.D. Ky.). As noted, this alleged scheme is similar in nature to the instant criminal case but involved different individuals (except for Konter), companies, and most of the alleged conduct occurred in the Kentucky area.

(A) the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath;

(B) the right to plead not guilty, or having already so pleaded, to persist in that plea;

(C) the right to a jury trial;

(D) the right to be represented by counsel—and if necessary have the court appoint counsel—at trial and at every other stage of the proceeding;

(E) the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses;

(F) the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere;

(G) the nature of each charge to which the defendant is pleading;

(H) any maximum possible penalty, including imprisonment, fine, and term of supervised release;

(I) any mandatory minimum penalty;

(J) any applicable forfeiture;

(K) the court's authority to order restitution;

(L) the court's obligation to impose a special assessment;

(M) in determining a sentence, the court's obligation to calculate the applicable sentencing guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a); and

(N) the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence.

(2) Ensuring That a Plea Is Voluntary. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement).

> (3) Determining the Factual Basis for a Plea. Before entering judgment on
> a guilty plea, the court must determine that there is a factual basis for the
> plea.

Fed. R. Crim. P. 11(b). A review of the plea colloquy in this case clearly demonstrates that each

of the requirements set forth in Rule 11(b) were personally addressed by the Court with

Defendant. (*See* Tr. 5/20/10 Hr'g).

In this Court's estimation, Defendant is educated and intelligent enough. He is also

cunning. Having personally observed him on May 20, 2010, he clearly understood each of the

Court's questions as well as the rights he was waiving by entering a guilty plea. (*Id.*). He

expressed no hesitation in his desire to plead guilty and did not vacillate after making his

decision in court, despite being given every opportunity to do so. Indeed, Defendant agreed with

the Government's entire factual summary of his criminal conduct, admitted his guilt and by

doing so, firmly acknowledged his role in the conspiracy. (*Id.* at 25-28).

Beyond the plea colloquy, Defendant also admitted to the facts of this case during

presentence proceedings. As quoted above in its entirety, the PIR contains a detailed and

thorough recitation of Defendant's criminal conduct in this case. A tentative PIR was produced

to counsel by the Probation Office on July 29, 2010.[23] (Docket No. 36). The Government and

Defendant filed their positions with respect to sentencing factors on July 30, 2010 and August 9,

2010, respectively, indicating that neither had any objections to the PIR.[24] (Docket Nos. 37, 38).

The final PIR, containing the summary of Defendant's offense conduct, was disclosed to the

---

[23]       The Court does not have access to the Tentative PIR. *See* L. Cr. R. 32(C).

[24]       Defendant testified that he sent objections to the PIR directly to Thomassey. (Docket No. 84 at 129).
However, the Court does not find this testimony credible because he has presented no documents corroborating
same. If Defendant sent his letter by mail, fax or email, he should have copies. Also, Thomassey and/or the records
custodian from his office are certainly within the subpoena power of the Court. Because Defendant failed to present
these documents, the Court infers that such documents do not exist and/or do not support his position. *See United
States v. Cannistraro*, 734 F.Supp. 1110, 1121 (D.N.J. 1990) (negative inference may be drawn from a defendant's
failure to present evidence in support of a claim of innocence on a motion to withdraw a guilty plea).

Court and the parties on August 11, 2010. (Docket No. 39). The Probation Office's Addendum, filed on August 24, 2010, reflected that neither party raised any objections to the PIR. (Docket No. 41). Therefore, on August 9, 2010, Defendant again admitted his guilt at Count One and all of the facts underlying said offense. (Docket No. 38).

Rule 32(i)(3)(A) of the Federal Rules of Criminal Procedure and Local Criminal Rule 32(C)(11) permit the Court to accept as accurate any undisputed portion of the PIR as a finding of fact. *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court: (A) may accept any undisputed portion of the presentence report as a finding of fact."); *see also United States v. Gricco*, 277 F.3d 339, 355 (3d Cir. 2002). Given the discussion above, the time-period for objections to the facts in the PIR has passed and the Court may consider new objections only for "good cause shown." *See* L. Cr. R. 32(D) ("For good cause shown, the time limits set forth in LCrR 32 may be modified by the Court."). Neither Defendant nor his appointed counsel have moved for or established any "good cause" for his failure to raise timely objections to the PIR. Therefore, Defendant's failure to timely object to the facts in the PIR further undermines his assertions of innocence proffered to the Court.

The Government did not bear the burden to prove Defendant's guilt during the motion hearing, however, it effectively proved its case against Defendant during its cross examination of him. *See Jones*, 336 F.3d at 252 (the burden of demonstrating a fair and just reason to permit the withdrawal of a guilty plea "falls on the defendant, and that burden is substantial"). Despite his evasiveness, Defendant admitted almost all of the material facts supporting the conspiracy charge against him.

Again, he has been convicted of one count of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349. Section 1349 provides that "[a]ny person who attempts or

conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy." 18 U.S.C. § 1349. The object offenses of the conspiracy were mail and wire fraud under sections 1341 and 1343, respectively. *See* 18 U.S.C. §§ 1341, 1343. The elements of conspiracy to commit mail and wire fraud include that: (1) two or more persons agreed to commit mail and wire fraud; and (2) Defendant knowingly and voluntarily joined the conspiracy. *See United States v. Berger*, 2010 WL 42379252, at *4 (W.D.Pa. Oct. 21, 2010) (citing *Whitfield v. United States*, 543 U.S. 209 (2005)) (holding that there is no "overt act" requirement under section 1349).

At the hearing, the Government presented evidence supporting most of the allegations in the indictment including having the Defendant admit to, among other things: the fact that he had grossly overstated the income of his companies and presented different financial statements to American Express than to the Internal Revenue Service in order to obtain credit lines; that he directed Susan Fawcett to process false credit card orders through her merchant account; that the invoices prepared by Fawcett and presented to Defendant's companies for payment were fraudulent; that he directly paid Konter $5,000 on a number of occasions rather than paying American Express for services allegedly rendered; and that he was aware that Fawcett had lied to American Express representatives who questioned her about a fake name used to set up an account. (Docket No. 84 at 67-71, 72-86, 90-104; Govt. Ex. 3, 4, 10). Most telling, despite his complaints that the loss amount was never proven, Defendant testified that the loss to American Express from the instant criminal activity was $545,000.00.[25] (Docket No. 84 at 39, 87, 114). Of course, the actual amount of the loss is not relevant except to restitution because the parties

---

[25]     The Court notes that during his initial interview with Inspector Anderchak on February 21, 2007, Defendant advised that the loss suffered by American Express was only $395,000. (Govt. Ex. 1 at 4).

stipulated that the loss amount in this case is between $400,000 and $1,000,000.[26]  (*See* Docket No. 32).  As a whole, the evidence presented at the motion hearing demonstrated Defendant's guilt and did not support his claim of innocence.

In light of Defendant's answers during the plea colloquy; his later admissions to the factual content of the PIR; the evidence presented at the February 8, 2011 hearing; his demeanor at both the change-of-plea and motion hearing; and, this Court's determination of his credibility or lack thereof, this Court finds that Defendant's eleventh-hour claims of innocence ring hollow.

     b.     *Strength of Reasons for Withdrawal*

The Court must also consider the strength of Defendant's proffered reasons for the withdrawal of his guilty plea. Here, Defendant maintains that he was coerced into pleading guilty at the insistence of his former counsel, Patrick Thomassey, Esquire.  (Docket No. 70).  He further maintains that this coercion demonstrates that Mr. Thomassey provided him ineffective assistance of counsel during pre-trial proceedings.  (*Id.*).

"In order for a guilty plea to be valid, it must 'represent a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  *United States v. Jones*, 336 F.3d 245, 253 (3d Cir. 2003) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)).  "A court will permit a defendant to withdraw a guilty plea based on ineffective assistance of counsel only if (1) the defendant shows that his attorney's advice was under all the circumstances unreasonable under prevailing professional norms, and (2) the defendant shows that he suffered 'sufficient prejudice' from his counsel's errors." *Jones*, 336 F.3d at 253 (citing *United States v. Day*, 969 F.2d 39, 42-45 (3d Cir. 1992), *which cited*, *Strickland v. Washington*, 466 U.S. 668, 687-91 (1984)).

---

[26]     Defendant still has the ability to put the Government to its proof of the restitution amount at sentencing. Although the Court would note that both Konter and Fawcett agreed that the restitution amount was properly calculated at $574,134.40, which indicates that the amount may be correct.  (Cr. No. 08-264, Docket Nos. 27, 52; Cr. No. 08-267, Docket No. 53).

Effectiveness of counsel is measured by an objective standard of professional reasonableness. A court "deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689.

> Where an attorney's actions are the result of "strategic choices" this presumption of reasonableness is even stronger. If the strategic choice is "made after thorough investigation of the law and facts relevant to plausible options," the Supreme Court has held that the presumption of reasonableness is essentially irrebuttable. Even if an attorney's strategic choice is made "after less than complete investigation," those choices are still considered "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Marshall v. Cathel*, 428 F.3d 452, 462-63 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690-91). Courts have looked to the ABA Standards for Criminal Justice "'as guides to determining what is reasonable'" under prevailing professional norms. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting *Strickland*, 466 U.S. at 688)). Defendant raises two arguments regarding the reasonableness of his trial counsel's conduct: (1) that Mr. Thomassey failed to conduct a

sufficient investigation of the facts of this case prior to Defendant's guilty plea; and (2) that Mr. Thomassey coerced Defendant into pleading guilty, as set forth in his May 10, 2010 letter.

Before addressing these specific arguments, the Court notes that Mr. Thomassey is an experienced criminal defense attorney who has represented numerous individuals in criminal cases over a thirty-five plus year career. He has appeared before this Court on multiple occasions and has always been prepared and provided professional representation to his clients. Despite Defendant's recent claims that Mr. Thomassey provided ineffective assistance to him, at the change-of-plea proceeding, Defendant twice advised this Court that he was satisfied with Mr. Thomassey's representation of him. Specifically,

> THE COURT: Mr. Shumaker, based on your appearance and demeanor in this courtroom, based on your responses to my questions, and your counsel's representations, I find that you're competent, so that you can meaningfully participate in today's proceeding, and so that we can go ahead.
>
> Mr. Shumaker, let's talk now about your case. Have you had ample opportunity to discuss your case with your attorney, Mr. Thomassey?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Are you satisfied with the job he has done for you so far?
>
> THE DEFENDANT: Yes, ma'am.
>
> …
>
> THE COURT: Once again, Mr. Shumaker, are you satisfied in all respects with the advice and representation of your counsel, Mr. Thomassey, to this point?
>
> THE DEFENDANT: Yes, ma'am.

(*Trans. 5/20/10 Hr'g* at 6, 31). This Court personally observed Defendant as he answered these questions and he offered no hesitation in affirming that Mr. Thomassey had represented him

well.  These statements, along with his knowing waiver of his trial rights, his acknowledgement

of the Government's burden at trial, of his guilt, and of the potential penalties resulting from his

guilty plea, wholly undermine his later ineffectiveness claim. *See United States v. Thomas*, 165

Fed.Appx. 138, 141 (3d Cir. 2006) (not precedential) (the defendant's ineffective assistance of

counsel claims "are undermined by his statements at his plea colloquy that he was satisfied to

have his lawyer represent him and that he understood the government's burden, his waiver of

rights, and the charges against him."); *see also United States v. Dowe*, 41 Fed.Appx. 561, 562

(3d Cir. 2002) (same).

Notwithstanding this finding, the Court will analyze Defendant's arguments that his

counsel failed to properly investigate the facts of his case and provided ineffective assistance to

him by allegedly coercing him to plead guilty.

Defense counsel's duty to investigate the facts in a criminal case is set forth at Standard

4-4.1(a), which provides that:

> Defense counsel should conduct a prompt investigation of the
> circumstances of the case and explore all avenues leading to facts
> relevant to the merits of the case and the penalty in the event of
> conviction. The investigation should include efforts to secure
> information in the possession of the prosecution and law
> enforcement authorities. The duty to investigate exists regardless
> of the accused's admissions or statements to defense counsel of
> facts constituting guilt or the accused's stated desire to plead guilty.

1 *ABA Standards of Criminal Justice* 4-4.1(a) (1993).  Pertinent here, the Commentary notes that

"[f]acts form the basis of effective representation" and "[t]he lawyer's duty to investigate is not

discharged by the accused's admission of guilt to the lawyer or by the accused's stated desire to

enter a guilty plea.  The accused's belief that he or she is guilty in fact may often not coincide

with the elements that must be proved in order to establish guilt in law." *Id.*  It is also incumbent

on defense counsel to meet with prosecutors and law enforcement agencies as these individuals may have facts in their possession that may not be discovered during formal discovery. *Id.*

Defendant's testimony regarding the alleged deficiencies in the investigation conducted by Mr. Thomassey was inconsistent and not credible. He first complained that Mr. Thomassey conducted no investigation of the facts of his case at all. (Docket No. 84 at 20-26). Then, on cross-examination, and after questioning by the Court, Defendant admitted that prior to his guilty plea defense counsel had reviewed with him: the affidavit supporting the search warrant executed at his place of business; two witness interviews of the Defendant conducted by government investigators which contain damaging admissions by the Defendant; the fact that Larry Konter and Susan Fawcett had pled guilty to the offense and agreed to testify against Defendant at trial; the fact that the ongoing investigation including the civil action in Kentucky[27] were potentially damaging to his case; and, the terms of the plea agreement with the Government to which he pled.[28] *Id.* at 20-22, 46, 62-64, 106-108, 128, 148-150; Govt. Ex. 1, 2, 12; Ct. Ex. 5).

Defendant's primary complaint is that defense counsel did not review each of the documents seized by the Government under the search warrant which remain in the possession of the United States Postal Inspectors and that he never received an itemization of the loss amount of approximately $545.000.00.[29] But, Defendant ignores the significance of the evidence against him that his counsel had reviewed, i.e., Inspector Anderchak's sworn affidavit and his two

---

[27]     Defendant well knew the facts of the Kentucky action and the allegations of fraud against him there. (*See* Docket No. 84 at 131-148). He was actively involved in the lawsuit from its inception. (*Id.*). He obtained counsel to defend him, but then later discharged his counsel and continues to represent himself, *pro se.* (*Id.*).

[28]     The Court notes that the executed plea agreement expressly states that Defendant had reviewed the plea agreement with his counsel, Patrick Thomassey, Esq. and agreed to its terms and conditions. (*See* Docket No. 32).

[29]     Defense counsel also seems to argue that Plaintiff took Defendant's money and ran. (Docket No. 84 at 157). In this Court's opinion, it is not unreasonable for defense counsel to require a retainer in a federal criminal case. Given Thomassey's experience, the amount of the retainer (i.e., $20,000.00) does not appear to be out of kilter with the private defense bar's hourly rate structure and practice. Finally, Defendant admitted that he only paid $11,000.00 of the $20,000.00 due and, thus, never actually paid the full retainer fee. (*Id.* at 16).

memoranda of interviews. (Govt. 1, 2, 12). These documents exquisitely detail the facts supporting the allegations in the Indictment. (*See* Docket No. 1). They also contain many damaging admissions by Defendant.

Unfortunately, Mr. Thomassey was not called as a witness at the hearing to challenge his investigation of this case. Hence, his precise strategy is not present in the record.[30] However, the evidence clearly shows defense counsel's opinions that Defendant was guilty of the offense charged, that he should plead guilty pursuant to the plea agreement offered by the Government and that the evidence which was seized by the Postal Inspectors was relevant only at the sentencing phase of this case as potential mitigation of Defendant's potential sentence.[31] (Def. Ex. A; Docket No. 70-1; Ct. Ex. 5). He also advised Defendant that if he did not plead guilty, the Government would use the Kentucky matter to "crush him." (Docket No. 84 at 128; Ct. Ex. 5).

Based on the limited record concerning Defendant's interactions with Thomassey, it appears that he may not have personally conducted an exhaustive examination of the seized evidence prior to Defendant's guilty plea. However, under *Strickland*, great deference must be given to a criminal defense attorney's decision to conduct an even "less than complete investigation," and this strategic decision is analyzed under the standard of objective

---

[30]     Defendant did not call Thomassey on cross during his case-in-chief. However, in this Court's estimation, it would have been the Government's burden to present testimony from Mr. Thomassey to rebut Defendant's testimony. *See Jones*, 336 F.3d at 252 (defendant has the substantial burden to demonstrate a "fair and just reason" to permit withdrawal of a guilty plea); *see also Brown*, 250 F.3d at 816-17 (discussing evidence presented by the government to rebut a defendant's contentions on a motion to withdraw plea). Of course, given the Court's findings herein regarding the lack of credibility of Defendant's testimony, Mr. Thomassey's testimony was not necessary to the Court's resolution of the present dispute.

[31]     The Court notes that Defendant further complains that Mr. Thomassey did not attempt to review the seized documents prior to sentencing. (*See* Docket No. 84 at 156-57; Ct. Ex. 4). However, Mr. Thomassey was permitted to withdraw as counsel in this case after Defendant's numerous *pro se* submissions were received by the Court (Ct. Ex. 5, 11, 12, 13, 14), many of which indicated that Defendant wished to terminate him and Defendant has yet to be sentenced. Accordingly, the effectiveness of Mr. Thomassey's counseling of Defendant after the guilty plea is not relevant to the present inquiry.

reasonableness, *Strickland*, 466 U.S. at 690-691, and no more.  In this Court's estimation, given the facts before this Court, Defendant did not present credible evidence sufficient to meet his burden of proving that Mr. Thomassey's representation was objectively unreasonable.  Instead, the facts show that Mr. Thomassey gleaned sufficient evidence against Defendant to recommend a plea before Defendant's entry of a guilty plea.  As required under the ABA Standards, Mr. Thomassey obtained evidence through traditional discovery (i.e., under Rule 16) and uncovered more significant evidence through meetings and discussions with the Assistant United States Attorney, whereby he apparently learned of the agreement of cooperating witnesses Konter and Fawcett to testify against Defendant and Defendant's own admissions.  (Govt. Ex. 1, 2, 12; Crim Nos. 08-264; 08-267).  Hence, the Court gives deference to Mr. Thomassey's decision to limit his investigation to this information because it was sufficient to support a conviction.

This holding is further buttressed by the fact that Defendant's position regarding the seized documents has been largely inconsistent.  In his *pro se* pleadings and throughout his testimony he has been adamant that the seized documents support his innocence.  (Ct. Ex. 5, 12, 13, 14).  However, he still has not made any real attempt to review the documents despite the Government's repeated statements that they were available for his review.  (*See* Docket No. 51).  A negative inference may be drawn from Defendant's failure to review the documents or to present them to the Court in support of his motion.  *See United States v. Cannistraro*, 734 F.Supp. 1110, 1121 (D.N.J. 1990) (negative inference may be drawn from a defendant's failure to present evidence in support of a claim of innocence on a motion to withdraw a guilty plea).  Thus, the Court concludes that Defendant did not review and/or present the seized documents because they simply do not support his claim of innocence.

In addition, despite being ordered by the Court to do so, present defense counsel Mr. Brink represented to the Court that an exhaustive examination of the seized documents was <u>not</u> necessary in order to present Defendant's motion to withdraw his guilty plea notwithstanding Defendant's claims of innocence. (Docket No. 84 at 4-5). Specifically, Mr. Brink advised that he reviewed the Rule 16 materials provided by the Government, i.e., those documents that the Government intended to present at trial, sentencing and the motion to withdraw proceeding. *Id.* Of course, Mr. Brink's lack of a detailed investigation wholly undermines his position that it was objectively unreasonable for Mr. Thomassey not to do the same, prior Defendant's guilty plea. In sum, the record fully supports this Court's conclusion that Mr. Thomassey conducted an objectively reasonable investigation of the facts of this matter prior to advising the Defendant to plead guilty. *See Strickland*, 466 U.S. at 690-691.

Defendant's claims that Mr. Thomassey coerced him into pleading guilty and advised him to merely respond yes to the Court's inquiries are also undermined by his demeanor and statements during the plea colloquy. Particularly,

> THE COURT: Mr. Shumaker, has anyone made any kind of a threat to you, or to anyone else, that has forced you to want to plead guilty here today?
>
> THE DEFENDANT: Um, no, ma'am.
>
> THE COURT: Has anyone made any kind of a promise to you that has caused you to want to plead guilty?
>
> THE DEFENDANT: No, ma'am.
>
> THE COURT: Has anyone made any prediction or promise to you as to what your actual sentence will be, other than what you have been told as minimum and maximum sentences, and what you have heard about guidelines?
>
> THE DEFENDANT: No, ma'am.

THE COURT: Has anything I have said here today, other than
what I told you about the potential sentence, suggested to you what
I will actually do on the date of your sentencing hearing?

THE DEFENDANT: No, ma'am.

THE COURT: Have you been instructed by your attorney, the
attorney for the government, or anyone else to respond untruthfully
to any question about a promised sentence?

THE DEFENDANT: No, ma'am.

…

THE COURT: So, you are voluntarily and of your own free will
planning to plea?

THE DEFENDANT: Yes, ma'am.

(*Trans. 5/20/10 Hr'g* at 29-31). The Court again credits Defendant's sworn statements that his

guilty plea was voluntary and that he was not threatened or forced to plead guilty, nor instructed

to respond untruthfully to any of the Court's questions. This prior testimony is also consistent

with the provisions set forth in the plea agreement executed twice by Defendant, wherein

Defendant acknowledged that "there [were] no other agreements, promises, terms or conditions,

express or implied" between he and the United States government. (Docket No. 32; Ct. Ex. 2).

These statements made under oath in open court also significantly weaken Defendant's

contention that Mr. Thomassey's May 10, 2010 letter to him coerced him to plead guilty. (Def.

Ex. A; Docket No. 70-1). Having reviewed the letter in its entirety, there is nothing to suggest

that Mr. Thomassey forced Defendant to plead guilty.[32] Rather, the Court reads the letter as Mr.

Thomassey responding to an inquiry from Defendant about his defense. In stark terms, Mr.

---

[32]     There is no evidence that Defendant is unstable. As the Court previously noted, he is intelligent, college-
educated and in good mental and physical health. (*Trans. 5/20/10 Hr'g* at 3-5). In addition, there is no suggestion
that Thomassey physically forced Defendant to plead guilty. To this end, despite his age, i.e. 68, Defendant appears
hale and hearty. He is also much taller than Thomassey who is not much younger than he.

Thomassey advised Defendant that "there is no way you can win your case." (*Id.*). Mr. Thomassey also provided his legal advice to Defendant, outlined the likely consequences if he did not enter a guilty plea, including that he faced a trial, which would be scheduled in short order.[33] (*Id.*). Indeed, the letter closes "[w]e have told the Judge that you are going to plead guilty on May 20, 2010 and then be sentenced sometime around five months later. That is still my best advice for you and you should follow it." (*Id.*). Mr. Thomassey reiterated his position that his legal advice to Defendant was to plead guilty at the change-of-plea hearing. Specifically,

> THE COURT: … Mr. Shumaker, having been advised of all of your rights, do you still wish to plead guilty, sir?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Mr. Thomassey, is this consistent with your advice?
>
> MR. THOMASSEY: It is, Your Honor, very much so.

(*Trans. 5/20/10 Hr'g* at 28-29). In this Court's view, there is nothing professionally unreasonable about Mr. Thomassey's advice to Defendant to plead guilty in this case. Simply put, Mr. Thomassey's strong urging to Defendant that he accept the favorable plea agreement that he negotiated on his behalf is professionally acceptable for criminal defense attorneys in federal criminal cases. *See United States v. Hall*, 2007 WL 406286, at *3 (M.D.Pa. Feb. 2, 2007) ("Urging a client to take a plea under such circumstances meets prevailing professional norms for criminal defense work.").

This type of advice is also consistent with the ABA Standards. Specifically, Standard 4-5.1, Advising the Accused, provides that:

---

[33] As noted above, trial of this matter was set for June 1, 2010 at the time of the change-of-plea and defense counsel estimated that trial would take place in July or August of 2010. (*See* Docket No. 25). In this Court's estimation, defense counsel was merely expecting that if Defendant chose to exercise his right to a trial, he would have also requested a continuance. The record fully supports this position.

> (a) After informing himself or herself fully on the facts and the law, defense counsel should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome.
>
> (b) Defense counsel should not intentionally understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused's decision as to his or her plea.

1 *ABA Standards of Criminal Justice* 4-5.1(a) (1993). The commentary further suggests that "[o]nce the lawyer has concluded that it is in the best interests of the accused to enter a guilty plea, it is proper for the lawyer to use reasonable persuasion to guide the client to a sound decision. However, defense counsel should recognize and should make clear to the client that he or she has the right to put the prosecution to its proof and that the decision whether or not to enter a guilty plea is ultimately for the client –not defense counsel—to make." *Id*.

Again, a guilty plea must be a decision made by a defendant's own free will and coercion may make a guilty plea involuntary. *United States v. Wilson*, 429 F.3d 455, 459 (3d Cir. 2005). Coercion includes the use of physical force, threats of physical force or use of one's economic power to overcome another's will resulting in submission. BLACK'S LAW DICTIONARY (9th ed. 2009). Along these lines, a threat by a criminal defense attorney to withdraw as counsel if a defendant does not plead guilty or a threat to withdraw if a defendant changes his mind after agreeing to plead guilty may also render a plea involuntary. *See Heiser v. Ryan*, 951 F.2d 559, 561 (3d Cir. 1991) (citing *United States v. Estrada*, 849 F.2d 1304, 1305-06 (1988)). There is no such evidence here.[34]

---

[34] The Court is troubled by Mr. Thomassey's assertion in his letter that had Defendant advised the Court that he wished to exercise his right to a trial at the May 20, 2010 hearing, he would be incarcerated pending a trial date. (*See* Docket No. 70-1; Def. Ex. A). As of that time, to this Court's knowledge, Defendant had not violated any bond condition. However, considering the entirety of the record, including the extensive plea colloquy wherein the Court advised Defendant of his right to exercise his trial rights and the constitutional protections afforded to him and Defendant's repeated acknowledgements of his rights, the Court does not find credible Defendant's assertions at the February 8, 2011 hearing that he actually believed that he would be so incarcerated. Instead, the Court's record shows he clearly and unequivocally advised the Court that his guilty plea was not coerced or involuntary at that time.

Defendant claims that he was coerced into pleading guilty by Mr. Thomassey in the May 10, 2010 letter. Defendant, however, advised the Court on April 20, 2010 that he intended to plead guilty in this case. (Docket No. 29). He then agreed to plead guilty by executing a copy of the plea letter on May 11, 2010 and the actual plea agreement during the May 20, 2010 change-of-plea hearing in open court. (Docket No. 84 at 123-124; Ct. Ex. 2). He orally re-iterated his stated desire to plead guilty during the May 20, 2010 change-of-plea hearing, which the Court has credited over his more recent statements at the February 8, 2011 hearing. On May 20, 2010, Defendant knowingly and voluntarily waived his trial rights, acknowledged his criminal conduct and entered a guilty plea. The Court found that the plea was knowingly and voluntarily made on that date and stands by that ruling.

However, even if Defendant had demonstrated that his counsel's representation of him was objectively unreasonable, Defendant still has not demonstrated that he was prejudiced by such representation during the pretrial phase, plea negotiations or at the change-of-plea proceeding. As to prejudice, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.[35] In the context of the present motion, Defendant must

---

Further, Defendant did not present the Court with his May 3, 2010 letter to Thomassey which preceded this exchange. *See* n. 6, *supra*. To the extent that Defendant suggested engaging in conduct which would have violated his bond conditions (Docket No. 10), including failure to appear for court proceedings and such violations were proven, the Court could have revoked Defendant's bond and incarcerated him during trial. *See* 18 U.S.C. § 3148.

[35] The Court notes that in *Strickland*, the Supreme Court recognized that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. As explained *infra*, Defendant was clearly not prejudiced by his guilty plea. Indeed, his counsel gave him appropriate advice. However, the Court conducts the totality of the *Strickland* analysis for completeness.

demonstrate that but for his prior counsel's errors, he would not have pled guilty. He cannot meet this burden.

Defendant was not prejudiced by the plea agreement in this case. Indeed, Mr. Thomassey negotiated a plea agreement on Defendant's behalf which appears to be more favorable to him than the plea agreement negotiated in Konter's case, despite the fact that the Government continues to maintain that Defendant was the more culpable party in this scheme and Defendant's guilty plea was secured a mere 11 days before trial was set to commence. (*Compare* Docket No. 32, *with* Cr. No. 08-267, Docket No. 20). Defendant's plea agreement included stipulated guideline calculations, resulting in a range of 27-33 months. (Docket No. 32). However, Konter's plea agreement did not include the same type of specific stipulations as to the guidelines range; the parties only stipulated as to the loss amount of between $400,000 and $1,000,000 for guidelines purposes. (Crim. No. 08-267, Docket No. 20). Therefore, an additional two-level enhancement under Guideline §3B1.3 was applied in Konter's case, resulting in a higher total offense level and a guideline range of 33-41 months. (Crim. No. 08-267, Docket No. 38). In addition, as the Assistant United States Attorney pointed out at the motion hearing, the plea agreement does not contain enhancements which arguably apply to this case, including an increase in the loss amount of an additional $2.6 million dollars for the relevant conduct in the Kentucky case,[36] a leadership role enhancement[37] or a separate

---

[36] Pursuant to Guideline § 2B1.1(b)(1)(J), a defendant's offense level is increased by 18 levels if the loss amount were between $2,500,000 and $7,000,000. In this case, an additional four levels would have applied if such an enhancement was appropriate.

[37] Pursuant to Guideline § 3B1.1(c), a two-level enhancement applies if the "defendant was an organizer, leader, manager, or supervisor in any criminal activity."

enhancement for use of sophisticated means to facilitate the fraud.[38]   (Docket No. 84 at 106-

109).  Collectively, these enhancements could have increased Defendant's total offense level at

least eight (8) levels to level 26, and considering a criminal history category of I, would result in

an advisory guideline range of 63-78 months rather than the 27-33 months recommended in the

plea agreement.  (*See* Docket No. 32).  Therefore, through his negotiation and this plea

agreement, Mr. Thomassey successfully limited his client's sentencing exposure and performed

more than adequately.[39]  *See also United States v. Black*, 2006 WL 759691, at*5 (E.D.Pa. 2006)

("[a] criminal defense attorney's decision to recommend that his client accept a plea agreement

reducing potential sentencing exposure generally falls within the wide range of reasonable

professional competence.").

This Court has presided over Defendant's case as well as Fawcett's and Konter's from

their inception.  The evidence of guilt against these three individuals is overwhelming and both

Fawcett and Konter had agreed to testify against Defendant, if his case should go to trial.  There

is little doubt that Defendant would have been convicted at trial.  Yet, due to Mr. Thomassey's

skillful handling of plea negotiations in this case, Defendant's sentencing exposure is

significantly limited in light of his decision to plead guilty pursuant to a plea agreement.

(Docket No. 57, 61).  Further, the Court advised Defendant during the plea colloquy that if the

Court rejected the plea agreement between him and the Government, he would be given an

opportunity to withdraw his guilty plea.[40]  (*Trans. 5/20/10 Hr'g* at 15-16).  But, if he did not

---

[38]     Pursuant to Guideline § 2B1.1(b)(9)(C), a two-level enhancement applies if the offense involved the use of
sophisticated means or "especially complex or especially intricate offense conduct pertaining to the execution or
concealment of an offense."

[39]     The Court notes that Mr. Thomassey also had started to lay the foundation supporting an argument for a
variance below the advisory guideline range based on Defendant's age and his wife's ill-health.  (Docket No. 57;
61).

[40]     Specifically,

withdraw his guilty plea, the Court could dispose of Defendant's case in a manner less favorable to him than the terms set forth in the plea agreement. (*Id.* at 16). In response to these questions, Defendant again asserted that he understood. (*Id.*).

Finally, despite Defendant's protestations to the contrary, the Court believes that the true reason for his sudden desire to withdraw his guilty plea – raised only on the eve of his previously scheduled sentencing – is merely to avoid the type of punishment that has been imposed on his co-conspirators, Susan Fawcett and Larry Konter. Both were ordered to pay $574,134.40 in mandatory restitution, to be paid jointly and severally among them and Defendant. Although Konter has appealed his sentence, he is presently serving a sentence of 15 months incarceration and Fawcett is serving a lengthy sentence of probation with numerous conditions. Defendant presently faces a guideline range sentence of 27-33 months incarceration but can be sentenced to up to 20 years' incarceration under the statute, followed by 2-3 years of supervised release with mandatory restitution of $574,134.40 to be imposed. (Docket No. 42). Indeed, his *pro se* filings and letters indicate that he told Mr. Thomassey that he agreed to plead guilty if his sentencing could be postponed for one year in order to go after American Express and if his bond conditions

---

THE COURT:    … Mr. Shumaker, do you understand, then, that after reviewing the presentence investigation report, and any addendum, this Court can either accept or reject the plea agreement. Do you understand that?
THE DEFENDANT: Yes, ma'am.
THE COURT: Do you also understand that if this Court, after reviewing the presentence investigation report and any addendum, rejects the plea agreement, the Court will not be required to follow it, and you will be given an opportunity to withdraw your plea and to proceed to a trial on the charge in the indictment at Criminal No. 09-87.
You understand that?
THE DEFENDANT: Yes, ma'am.
THE COURT: Do you also understand if this Court rejects the plea agreement and you don't withdraw your plea, the Court could dispose of your case in a manner that might be less favorable to you than the terms set out in the plea agreement. Do you understand that?
THE DEFENDANT: Yes, ma'am.

(*Trans. 5/20/10 Hr'g* at 15-16).

could be altered to permit him the ability to visit his children and grandchildren.[41]  (Ct. Ex. 5, 12, 13, 14).  Of course, "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001) (quotation and citations omitted).   Accordingly, Defendant has not demonstrated that withdrawal of his plea should be permitted by this Court.

This conclusion is further supported by Defendant's conduct in the civil action pending against him in the United States District Court for the Western District of Kentucky, where a claim of more than $2,600,000 has been asserted against him.  As in the instant case, he has taken steps in that court to repeatedly delay the proceedings and avoid potential liability, including filing frivolous *pro se* motions and generally being uncooperative during discovery.  Hence, it appears to this Court that Defendant is attempting to use these criminal proceedings to delay the civil case and vice-versa.

---

[41]        Specifically, in his *pro se* "Emergency Motion to Stay Proceedings Pending Investigation of American Express and Recent Discovery", Defendant states that:

> Defendant pro se needs additional time to accomplish the following:  Without his files, mitigation is virtually impossible.  No action has been taken regarding Defendant Pro se's Bond blocking visitation with children and grandchildren.  Time is necessary to allow Defendant Pro se's wife to mend or make arrangements if not timely.  Fraudulent actions by American Express have now been reported to various investigative agencies given that years of negotiations with American Express have failed to produce a solution.  Time is needed for the agencies to react and for Defendant Pro se to negotiate a settlement.  Time is necessary to conclude the Kentucky matter as it directly impacted all that went on in the Pennsylvania matter.  Since May 20, 2010, new damaging information has serviced [sic] regarding American Express, the investigation, Larry Konter, American Express counsel in Kentucky, Compass Bank and others.  Time is necessary to determine what effect these findings had on Defendant Pro se's Indictment and Confession.

> THEREFORE, Defendant Pro se respectfully asks the Honorable Court to Stay further proceedings not less than one year pending the investigation of American Express and recent Discovery.

(Ct Ex. 5).

In sum, Defendant has failed to meet his burden to credibly demonstrate any reason sufficient for this Court to permit him to withdraw his guilty plea.

c. *Prejudice*

As discussed above, Defendant has failed to meet his burden to present credible evidence of his actual innocence or to establish a sufficiently strong reason to permit the withdrawal of his guilty plea. It is well-settled that "the Government need not show … prejudice when a defendant has failed to demonstrate that the other factors support a withdrawal of the plea." *Jones*, 336 F.3d at 255 (citing *United States v. Harris*, 44 F.3d 1206, 1210 (3d Cir. 1995)). Therefore, the Court need not consider the potential prejudice to the Government.

However, in this Court's estimation, the Government would clearly be prejudiced if Defendant were permitted to withdraw his guilty plea at this late stage of the proceedings. The conspiracy in this case took place between June 2005 and December 2007. (Docket No. 1). This matter was set for trial to commence on June 1, 2010 but the trial was cancelled given Defendant's guilty plea. A seven month delay has ensued between Defendant's guilty plea and the filing of his motion to withdraw it. To this end, even "a delay of several months can induce the Government to relax its evidence-efforts in reliance on the guilty plea." *United States v. Fuller*, 311 Fed.Appx. 550, 553 (3d Cir. 2009) (citing *United States v. Brehm*, 442 F.3d 1291, 1298-99 (11th Cir. 2006)). As the Government points out, it is axiomatic that over time memories fade, witnesses become unavailable and a case is generally more difficult to prove. *See United States v. Houser*, 2010 WL 5154389, at *2 (3d Cir. 2010) (district court did not abuse its discretion to deny motion to withdraw guilty plea made over a year after it was entered). Although the Government did file one motion for a continuance of Defendant's sentencing,[42]

_____

[42] The continuance was granted because the sentencing date conflicted with the Assistant U.S. Attorney's trial schedule. (*See* Docket No. 45).

much of the delay since that time has resulted from Defendant's filing of frivolous *pro se* motions, his failure to appear for a hearing on December 8, 2010 and the present motion to withdraw his guilty plea. As these delays are solely attributable to Defendant's conduct, any further delay would certainly prejudice the Government.

This Court is also mindful that the Supreme Court has held that "[s]ociety has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest." *Barker v. Wingo*, 407 U.S. 514, 527 (1972). Likewise, the litigants have an interest in a speedy resolution to these proceedings, as articulated in the Federal Rules of Criminal Procedure.[43] *See* FED.R.CRIM.P. 2 ("These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense."); *see also* FED.R.CRIM.P. 32(b) ("The court must impose sentence without unnecessary delay."). Also, the victim of Defendant's crime, American Express, shares the interest in concluding these proceedings, as Defendant should be ordered to commence making restitution payments as soon as possible, in order to begin to pay down the $574,134.40 in losses which were sustained.[44] *See* 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the

---

[43] The Court notes that:

> The mission of the United States District Court for the Western District of Pennsylvania is to preserve and enhance the rule of law while providing an impartial and accessible forum for the just, timely and economical resolution of legal proceedings within the court's jurisdiction, so as to protect individual rights and liberties, promote public trust and confidence in the judicial system, and to maintain judicial independence.

Mission Statement of the United States District Court for the Western District of Pennsylvania, available at: http://www.pawd.uscourts.gov/.

[44] The Court notes that given Defendant's age, 68, the bulk of restitution will fall on Konter (56 years old) and Fawcett (59 years old) because of their respective ages. Moreover, both of them seem more likely to be able to achieve gainful employment whereas Defendant has not worked for a living in years. (*See* PIR at ¶¶ 50-53).

full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."). Permitting further delays in this case would undermine these respective interests in a just and swift resolution to these proceedings. Accordingly, Defendant's sentencing will be scheduled forthwith and <u>no</u> further continuances will be permitted, without good cause shown by either the Defendant or the Government.

IV. CONCLUSION

Based on the foregoing, Defendant's motion to withdraw his guilty plea [70] is denied. Defendant's guilty plea was knowingly and voluntarily made and accepted by this Court. Moreover, Defendant has failed to present any credible evidence of his alleged innocence or demonstrate any reason sufficient for this Court to permit him to withdraw his guilty plea. Defendant's sentencing will be scheduled forthwith. An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   March 28, 2011

cc/ecf:  All counsel of record.

Patrick J. Thomassey, Esq.